# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 13 |
| ANDREW SCOTT WILSON AND SHELLY LYNN WILSON, | CASE NO. 04-65540 |
| | JUDGE RUSS KENDIG |
| Debtors. | |
| | **MEMORANDUM OF OPINION (NOT INTENDED FOR PUBLICATION)** |

Before the court is the Application for Compensation filed by Debtors' counsel, Donald M. Miller (hereafter "Attorney Miller"), on August 6, 2007. Through the fee application, Attorney Miller seeks a total of $12,510.00, of which $1,250.00 has been paid. Debtors filed an objection on August 31, 2007. A hearing was held on October 10, 2007. Attorney Miller and Debtor Andrew Scott Wilson participated in the hearing. Following the hearing, and at the court's request, Attorney Miller filed the fee agreement.

The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and the general order of reference entered in this district on July 16, 1984. Venue in this district and division is proper pursuant to 28 U.S.C. § 1409. The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## FACTS

Debtors filed a chapter 13 petition on October 15, 2004 and were represented by Attorney Miller. Included with the petition was a "Disclosure of Compensation of Attorney for Debtor(s)" ("2016(b) disclosure"). It indicates that he charged Debtors $1,250.00 for legal services. It is signed by counsel and does not require debtors' signatures. According to the disclosure, Attorney Miller received $300.00 prior to filing the case, in addition to the $194.00 filing fee. The remainder of the fees were to be paid through the plan. The 2016(b) disclosure also states that a mortgage was recorded to secure the fees and that the balance of the fees are to be determined by application; this is also disclosed in the Statement of Financial Affairs. Additionally, in paragraphs six and seven, the disclosure provides:

> 6. In return for the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
b. Preparation and filing of any petition, schedules, statement of affairs and plan which may be required;
c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;
d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters;
e. [Other provisions as needed]

7. By agreement with the debtor(s), the above-disclosed fee does include the following service:

Question 7 was left blank, indicating that no service was excluded.

In addition to the 2016(b) disclosure, at the request of the court, Attorney Miller also filed a copy of his "Fee Engagement Agreement for Chapter 13 Proceeding." The document was executed on November 11, 2003 and is signed by both debtors and counsel. The following are listed as services included:

(1) Analysis of the financial situation and rendering advise and assistance to the client in determining whether to file a petition under TITLE 11, United States Code;
(2) Preparation and filing of the petition, lists, statements or schedules;
(3) Representation of the debtor at the Section 341 Meeting;
(4) Amendments of lists, statements or schedules to comport with developments which may have occurred before or at the Section 341 Meeting;
(5) Attendance, if necessary, at confirmation hearings;
(6) Removal of garnishments or wage assignments;
(7) Negotiation of valuation of secured claims and/or the presentation of evidence thereon at confirmation hearings;
(8) Additional phone conferences;
(9) Objections to claims (without hearing);
(10) Relief from Stay Proceedings (2);
(11) Modification of Plan (1);

The following services are listed as services which may be requested but not covered by the disclosed fee:

(a) Motions/Objections (requiring a hearing);
(b) Relief from Stay Proceedings (after 2);
(c) Adversary or contested proceedings;
(d) Extraordinary time spent on any matter outside of the usual and customary;
(e) Title or lien search relating to real property;
(f) Modifications of Plan (after 1).

>               ATTORNEY reserves the right to file a Fee Application
>               which will supplant the foregoing.

The fee for any additional services is not disclosed, nor is there any reference to the $1,250.00 set forth in the 2016(b) disclosure.

In addition to $300.00 received prior to filing, Attorney Miller was paid $950.00 through the plan. On August 6, 2007, Attorney Miller filed an application for compensation seeking a total of $12,510.00, or $11,560.00 in additional compensation.[1] According to the itemized fee application, Attorney Miller spent 83.4 hours on this case, resulting in an hourly rate of $150.00.

Debtors objected to the supplemental fee application on August 31, 2007. Debtors state that they "have never received any type of billing from Mr. Miller and had no idea that [we] would." Debtors indicate they do not have the means to pay the bill and are surprised that, after three years, this is the first time they learned they were subject to additional fees. Attorney Miller does not deny that Debtors were not sent any statements prior to the filing of the fee application.

## LAW AND ANALYSIS

The issue in this case is not about the competency of Attorney Miller. No objections have been raised as to the quality of the services rendered. Rather, the issues presented are whether the requested fee is reasonable and whether the delayed filing of the application impacts an award of compensation.

    A.    **Reasonableness of Fees**

The guidelines for compensation awards are set forth in 11 U.S.C. § 330. Section 330(a)(4)(B) provides:

> In a chapter 12 or chapter 13 case in which the debtor
> is an individual, the court may allow reasonable compen-
> sation to the debtor's attorney for representing the interests
> of the debtor in connection with the bankruptcy case based
> on a consideration of the benefit and necessity of such
> services to the debtor and the other factors set forth in this
> section.

In the Sixth Circuit, "reasonable compensation" is based on a lodestar calculation which requires a bankruptcy court to "multiply the attorney's reasonable hourly rate by the number of hours reasonably expended." *See* In re Boddy, 950 F.2d 334, 337 (6th Cir. 1991). The lodestar amount is subject to upward or downward adjustment based upon the following factors:

---

[1] The court notes that Miller failed to account for the $300.00 received prior to filing which is outlined in the 2016(b) disclosure. Therefore, the court concludes that the actual amount sought in the fee application is $11,260.00.

> (1) the time and labor required; (2) the novelty and difficulty
> of the question; (3) the skill requisite to perform the legal service
> properly; (4) the preclusion of other employment by the attor-
> ney due to acceptance of the case; (5) the customary fee;
> (6) whether the fee is fixed or contingent; (7) time limitations
> imposed by the client or the circumstances; (8) the amount in-
> volved and the results obtained; (9) the experience, reputation,
> and ability of the attorney; (10) the 'undesirability' of the case;
> (11) the nature and length of the professional relationship with
> the client; and (12) awards in similar cases.

Geier v. Sundquist, 372 F.3d 784, 793 (6th Cir. 2004) (citing Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)); *see also* Hensley v. Eckerhart, 461 U.S. 424 (1983).

The first factor in the lodestar analysis, the attorney's reasonable hourly rate, is a simple matter. Dividing the amount requested by the number of hours spent means that Attorney Miller is charging $150.00 per hour for his services. Although the court notes that the rate was not disclosed in either the 2016(b) disclosure or the fee agreement, it appears the parties had a meeting of the minds as to the rate. The rate was not contested.

On the other hand, the second consideration, evaluation of the "hours reasonably expended," is a monumental task. Determining whether the course of action that was undertaken, by taking a prospective view from the commencement of the case, results in a vastly different scene than viewing the case retrospectively. Hindsight is not always the best looking-glass for analyzing a case, and this case makes that point vividly. At a first glance, it is easy to conclude that this case achieved very little for Debtors. When the case was commenced, Debtors had interests in two parcels of real estate; three cars, two secured by liens; and $10,263.00 in unsecured debt. Looking at the first plan, it appears Debtors entered into this case intending to keep all the property. However, at the hearing Debtor stated that the real estate was surrendered and he drives a thirteen year old car. If approved, this fee application would create debt that was more than the unsecured debt listed on the petition at the time of filing.

This was anything but a typical case, and a closer look reveals much more than a cursory review. Chapter 7 was not an option for Debtors because they had obtained a chapter 7 discharge for a case filed in 2003 (where they were also represented by Attorney Miller). Debtors had incurred additional debt since the chapter 7 discharge, plus they were more than $20,000.00 in arrears on their mortgage. The chapter 13 process offered them an opportunity to cure the arrearage, strip off a second mortgage, cram-down their vehicles, pay their priority debt over time, and obtain a discharge of any unsecured debt not paid through the plan. When the case commenced, chapter 13 held promise for Debtors.

Of course, in order to recognize the promise, Debtors needed to fund the plan. Under 11 U.S.C. §109(e), one of the eligibility requirements for chapter 13 is that an individual have "regular income." This is further defined at 11 U.S.C. §101(29), which defines "individual with regular income" to mean an "individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan

under chapter 13 of this title . . . ." While the Statement of Financial Affairs identified total combined income of $46,000.00 from 2002 to 2004, Schedule I disclosed monthly net income of $4,249.00.[2] Although the court finds it slightly implausible, Debtors submitted their schedules under the penalty of perjury and attested to their veracity. Further, the view of "regular income" can look to the future, see In re Troyer, 24 B.R. 727 (Bankr. N.D. Ohio 1982) (citing In re Mozer, 1 B.R. 350 (Bankr. D. Co. 1979)), and can include income from self-employment. See In re Jutila, 111 B.R. 621 (W.D. Mich. 1989) (citing In re Hammonds, 729 F.2d 1391 (11th Cir. 1984)). From the outset, Attorney Miller recognized the funding challenge faced by Debtors and the court is convinced this issue was addressed with Debtors. See Counsel's Response to Debtors' Objection to Fee Application, Ex. B. The court is also aware that Debtors' financial situation prior to filing was dismal, evidenced by the irregular income and the return of a $194.00 check payable to Attorney Miller prior to their filing. Id., Ex. C.

As Debtors soon found out, funding the plan proved difficult and multiple problems in this case stemmed from Debtors' inability to provide adequate funds. Eventually, Debtors were forced to liquidate assets through the chapter 13 proceeding. The unexpected turn the case took clearly resulted in the need for additional services, so additional time and labor expenditures are anticipated. However, the court recognizes even a boxer has to avoid the needless, draining effort of throwing wild punches. Debtors' unrealistic expectations, or unrelenting optimism, or incorrect memory, or a combination of the three, gave rise to the case's twisting path. And, with the conflicting backdrops of possibility and inability, the court reviews the fee application to determine the reasonableness of the hours expended on this case.

In addition to the fee application, the 2016(b) disclosure and the fee agreement, two orders impact the decision in this case: General Order 93-1, titled "Guidelines for Compensation and Expense Reimbursement of Professionals," and Administrative Order 04-02,[3] which governs the procedure for allowance of attorney's fees in chapter 13 cases. At the time of this filing, the administrative order provided a no-look fee of $1,250.00.[4] It appears that Miller used $1,250.00 as the base, or minimum fee. This amount is mentioned in the 2016(b) disclosure, but the document also clearly indicates that a fee application would be filed for additional fees. The court hesitates to rely solely on the 2016(b) form because it is not signed by Debtors. Looking at the fee agreement, it

---

[2] According to Schedule I, Mr. Wilson had been employed with Wilson Environmental for one month as a manager in addition to the estimated $2,500.00 earned by Mrs. Wilson from Seattle's Coffee House, the business operated by Debtors.

[3] Administrative Order 04-02 superceded Administrative Order 01-07 but was not fully effective until November 1, 2004 – after this case was filed. Thus, it is not completely clear which order Miller was relying on, although the court notes a Rights and Responsibilities of Chapter 13 Debtors and Their Attorneys (hereafter "Rights and Responsibilities") was filed in this case in compliance with Administrative Order 04-02.

[4] On July 19, 2005, Debtors filed a signed copy, dated October 15, 2004, of the Rights and Responsibilities.

references an "above-disclosed fee" which the court interprets this to mean the $1,250.00 fee coupled with the right to file a supplemental fee application. The fee agreement, which is signed by Debtors, reserves the right to file a fee application. Consequently, the court finds that the $1,250.00 fee was the base fee, not the total fee, and the disclosure provides that the total fee for this case was the base fee of $1,250.00 plus any additional amounts approved under a fee application. The court cannot determine that this case was intended to be covered by a flat fee, but finds that Miller, from the outset, contemplated filing a fee application. This interpretation also means that the court finds Debtors knew, or should have known, that a fee application would be filed if the fees exceeded $1,250.00.[5]

As a general rule, in a standard chapter 13 case, the no-look fee traditionally encompasses services through confirmation of the plan. *See* Admin. Ord. 04-02. In addition to these services, it also includes limited, typically post-confirmation, services. According to the fee application, Attorney Miller had invested 14.6 hours, or $2,190.00, *before* the case was filed. By the time the case was confirmed on July 21, 2005, Attorney Miller had spent 36.3 more hours on the case, for an additional $5,445.00. As a result, at the time of the confirmation hearing, the fees totaled $7,635.00. Although some additional services were rendered, and warranted, the court finds that the total time expended was not reasonable.

Quite simply, the hours spent on this case are unreasonably high. The court finds the stemmed from the following factors: (1) the debtors were not fully cooperative during the case; (2) the debtors spent time tilting at windmills; (3) the debtors remembered facts that directed courses of action when the facts could not be proved; and (4) at points, it seems that counsel cared more about this case than debtors did, and therefore did not let it die. The court finds that it is unreasonable for the attorney in a case to care more than the debtors do, to chase the uncatchable and to believe beyond reason. Attorneys are gatekeepers as well as advocates in a system in which we know the litigants have a limited ability to pay.

For example, the court notes that Attorney Miller had four meetings[6] with Debtors prior to the filing, for a total of 6.3 hours. Immediately following the filing, Attorney Miller had a fifth consultation with clients, resulting in amendments to the schedules and the filing of an amended plan. In most cases, five consultations to file a case is wholly unreasonable. This is supported by a review of the fee agreement, whereby the court surmises the following: Debtors were facing a foreclosure and sought bankruptcy assistance. Attorney Miller met with them, discussed their options, and explained the steps necessary to file a case. Debtors dilly-dallied by making appointments and cancelling them; providing incomplete information; failing to make themselves available

---

[5] Based upon the sheer number of office consultations, phone conferences, and letters Debtors received from Miller, to say nothing of the actual representation through pleading and negotiation, Debtors could not realistically expect the fee in this case to be a flat rate of $1,250.00.

[6] Although many attorneys offer a no fee initial consultation, generally of limited length, Attorney Miller apparently does not utilize such a consultation.

to sign the petition, and then either needed or desired to have the case filed promptly to stop the foreclosure. As a result, the debtors had to have a fifth consultation with Attorney Miller immediately after the case was filed in order to review the accuracy of the filed petition. The result was the need for several amendments within days of filing. Thus, from the onset of the relationship, debtors were making unreasonable demands through their lack of cooperation.

Additionally, the hours expended in this case do not reflect its complexity. Many of the billed hours were not driven by the legal issues, but by both debtors' inability to complete, in a timely and reasonable manner, tasks that needed to be done and their drive to fight every fight. Attorney Miller's time may have better be spent telling his clients that he would not see them until they did what needed to be done.

The court also finds that Attorney Miller's hours are also often unreasonable. For example, Attorney Miller billed a total of 7.1 hours to prepare the plan and schedules. Looking at the petition, the initial filing was 33 pages long and included twenty entries on the matrix. From the court's perspective, this was a modest filing. Further, the court is not convinced that it took 7.1 attorney hours to prepare the petition. The court believes that if Attorney Miller did actually spend that amount of time on this task, part of the work involved was clerical in nature. Using Attorney Miller's <u>Vitagliano</u> case[7] as an illustration, the initial filing contained 34 pages and twenty-two entries on the creditor matrix. Attorney Miller billed 3.5 hours for preparation in that case, less than half of what is billed here.[8]

Next, the court comments on counsel's practice of billing an average of .30 hours for sending letters to clients. There is no doubt that Attorney Miller diligently kept clients advised of the status of the case, but the court finds the billing to be excessive. At this stage of his practice, Attorney Miller should have form letters for nearly every conceivable circumstance arising in a chapter 13 case. Besides minor tweaks to a form letter, sending the letter is clerical. Therefore, the court finds that .10 hours is a reasonable expenditure of attorney time on a standard letter. The court counted a total of fifty-one letters, billed at a total of 14.3 hours. On the opposite hand, however, the court also recognizes that many of these letters were sent because of Debtors' inattentiveness. In several instances, it is clear that Attorney Miller sent follow-up letters to letters because Debtors did not respond.

Other entries are of concern, including the "attention to file" entry. It is meaningless, in addition to the fact that the entry is often lumped together with a bundle of other services, a practice disallowed by General Order 93-1. The entry on January 26, 2006 is also problematic. On that date, Attorney Miller filed a motion to cancel the Ohio Legacy mortgage and billed 1.0 hours for the service. A second motion to cancel was filed on May 9, 2006 and withdrawn on May 15, 2006. Counsel billed 1.5 hours for the May filings. The court finds that the May services were duplicative, and unnecessary,

---

[7] The court recently issued an opinion on a fee application filed by Attorney Miller in <u>In re Vitagliano</u>, Case. No. 03-66142, Dkt. 87.

[8] The court is not completely convinced 3.5 hours is presumptively reasonable.

and therefore rejects both time entries. Attorney Miller also billed, on two separate occasions, 1.4 hours for a motion and objection to an arrearage claim (dates of 12/20/04 and 2/2/05). Upon review of the pleadings filed with the court, it is clear that the pleadings are identical save one paragraph. Thus, it should not have taken the same amount of time to file the second motion as it did the first motion. At one point, Attorney Miller also billed for a preliminary hearing on a motion for relief from stay. The court does not hold preliminary hearings on motions for relief, but sets the motions for final hearing upon the filing of an unresolved objection, so the entry is clearly puzzling. Although this list of billing issues is not necessarily exhaustive, it is illustrative of the court's position that the hours expended in this case are unreasonable.

On the other side, the court acknowledges the increased services resulting from Debtors' action (or inaction, as may be more appropriate). Difficult clients can create large fee applications. Take, for instance, the disturbingly similar facts of In re King:

> Debtor was a demanding client who was very adamant about wanting to retain her town home, changed her position on key issues a number of times, engaged in a large number of conversations with Baker's firm, and failed to make payments to her creditors and the Chapter 13 Trustee.

350 B.R. 327, 332 (Bankr. S.D. Tex. 2006). The court allowed the post-confirmation fees sought by counsel over debtor's objection.

As previously stated, Debtors immediately faced problems with funding. The trustee filed a motion to dismiss on December 3, 2004, before the 341 meeting had been held, for failure to make payments. Obviously, this is not a service anticipated this early in the case, so it would not be usual or customary. This was the first of three motions to dismiss filed by the trustee, all for lack of payments. Trustee also filed two notices of delinquency, as well as an affidavit attesting to Debtors' failure to cure the delinquency. At one point the case was dismissed, but later reinstated, because of the Debtors' payment history.

Also, as set forth above, this case required services above and beyond those in a typical chapter 13 case. Through the course of this case, Attorney Miller filed, on behalf of Debtors, amended schedules, an amended plan, six objections to claims, two modifications of plan, a motion to value (which required an evidentiary hearing), a motion for relief from stay to proceed with a state court case, a motion to avoid lien, and two motions to cancel a mortgage. Attorney Miller also dealt with two objections to confirmation, a motion for relief from an order, a motion for leave to respond , two motions for relief from stay, and two motions to extend time. This does not factor in any other behind the scenes efforts made by Attorney Miller which are not docketed. Many of these actions provided little or no benefit since Debtors lost most everything in the end.

The court is not convinced that Attorney Miller was not going too far in representing these Debtors. Without a doubt, counsel appeared to be putting forth more effort than Debtors. At the end of the case, because of "lost" payments and problems arising from Debtors' payment habits, Attorney Miller increased his involvement by

requiring Debtors to send the payments to him first, so he had a record, and he in turn sent the payments to trustee. This type of hand-holding is not always beneficial and results in an increased workload.

In light of the above, the court finds that an unreasonable amount of time was expended by Attorney Miller in this case.

### B. Timing of the Fee Application

As set forth in the facts, the timing of the fee application concerns the court. It is undisputed that Debtors did not receive any statements or invoices from Attorney Miller until served with a copy of the fee application. Debtors have been released from making payments under the plan and now face a fee bill of over $11,000.00. This is of grave concern to the court. At no point is it clear that the clients realized that their reflexive fighting over everything was resulting in nondischargeable debt. Thus, they did not have an opportunity to weigh their course of action. The court is also cognizant of the fact that Debtors embarked on a hopeless course of action, thereby increasing both attorney time and the court's time on this case. This is not to be encouraged.

The Bankruptcy Court for the Southern District of Ohio, when addressing the timing of fee applications, held that "a fee application should be submitted as soon as reasonably possible, or approximately 30 to 45 days, following the completion of the legal services rendered on a given issue." In re Newman, 270 B.R. 845, 848 (Bankr. S.D. Ohio 2001); see also Clendenin v. Burks, 2007 WL 2029060 (S.D. Ohio 2007) (unpublished). As the court recognized, the filing of a prompt fee application prevents unnecessary surprise to a debtor nearing completion of plan payments. This type of surprise is one of the complaints raised by Debtors in their fee application.

Although not nearing completion of payment, the debtor in In re Robinson, 368 B.R. 492 (Bankr. E.D. Va. 2007), was subjected to comparable surprise. Less than one year into the case, her counsel filed a post-confirmation fee application in excess of $13,000.00. The debtor objected to the fees, although there was no question about the quality of the services. She, like Debtors here, had not received an invoice until the fee application was filed, was mistakenly under the impression that the flat fee covered all services, and was financially strapped. After thoroughly detailing the allowable and unallowable portions of the fee application, the court found that the fees should not be disallowed, partially due to the fact that the services did benefit debtor, as debtor herself admitted. Id. The court ultimately decided that "an equitable result would be a further 20% reduction in the amount to be approved." Id. at 502. The court withheld authorization for payment of the fees, however, to prevent harm to the unsecured creditors, holding that the payments, if necessary, could wait until after completion of the plan. Id.

Manifold problems arise from failing to keep clients apprised of fees. First, all clients, but particularly litigious and unreasonable ones, are set loose on the public and the courts to battle on every issue. Second, the clients lack of knowledge as to the cost of such a course of action denies them the opportunity to control their conduct and consumption of legal services in a cost effective manner. Third, this results in the creation of nondischargeable debt. The end results are cases such as the present one in

which clients made unreasonable demands resulting in almost no benefit. This directly impacts section 330(a)(4)(B)'s requirement of "consideration of the benefit and necessity of such services . . . ."

In line with both <u>Newman</u> and <u>Robinson</u>, the court finds the timing of Attorney Miller's fee application to be a significant concern. The type of surprise wrought by this fee application is needless. Debtors believed their plan to be complete and, after being released from payments by the trustee, find out their attorney is requesting more than $11,000.00 in fees. Using <u>Robinson</u> as guidance, the court hereby reduces Attorney Miller's allowed fee application by 50%. The increased percentage accounts for the fact that Attorney Miller's fee application was filed significantly later than <u>Robinson</u> and also accounts for the fact that the court is convinced that the hours which were expended were unreasonable, as partially outlined above. Consequently, the court allows half of the request, or $6,255.00. A total of $1,250.00 has been paid, leaving a balance due of $5,005.00.

Additionally, the court also finds that future fee applications must be filed in a timely manner and adopts the rule set forth in <u>Newman</u>. Generally, fee applications for services not covered by the no-look fee should be filed thirty to forty-five days after completion of each matter. Alternatively, if a single service is not identifiable, counsel should submit a fee application no less than quarterly.

An order will be issued immediately.

/s/ Russ Kendig NOV 3 0 2007
RUSS KENDIG
U.S. BANKRUPTCY JUDGE

**Service List**:

Toby L. Rosen
Charter One Bank Building, 4th Floor
400 W. Tuscarawas St.
Canton, OH 44702

Donald M. Miller
1400 Market Ave., N.
Canton, OH 44714-2608

Andrew Scott Wilson
Shelly Lynn Wilson
810 Quinby Ave.
Wooster, OH 44691